**APPENDIX A**

16

Case 3:02-cv-02192-WWE    Document 18-2    Filed 12/18/2003    Page 1 of 10

October 29, 2002      -1-      Final Decision and Order 02-138

APPENDIX A

## STATE OF CONNECTICUT
## DEPARTMENT OF EDUCATION

Student v. Greenwich Board of Education

Appearing on behalf of the Parents:    Attorney Lawrence W. Berliner
                                           Klebanoff & Phelan
                                           433 South Main Street
                                           West Hartford CT 06110

Appearing on behalf of the Board:    Attorney Valerie E. Maze
                                           Town of Greenwich
                                           101 Field Point Road
                                           Greenwich CT 06836-2540

Appearing before: Attorney Margaret J. Slez, Hearing Officer

## FINAL DECISION AND ORDER

### ISSUES:

1. Did the Board follow proper procedures in determining the eligibility of the student for graduation?

2. Did the Board improperly deny the student special education and related services during the 2000-2001 and 2001-2002 school years after the student's graduation with a regular high school diploma?

3. Did the Board improperly deny the student's request for an independent evaluation after the student's graduation with a regular high school diploma?

4. Did the Board commit procedural violations so gross as to entitle the student to compensatory education?

### SUMMARY:

The student, now 21 years old, was diagnosed with Asperger's syndrome and ADHD in 1994, and graduated from the Board high school with a regular diploma on June 22, 2000, at age 18. At a PPT meeting convened at the parent's request on September 5, 2001, the parent requested compensatory education for the student and an independent evaluation, both of which requests were denied by the Board. (Exhibit H.O.-1) On April 24, 2002, the parent requested a due process hearing, seeking compensatory education and an independent evaluation on the grounds that the Board had improperly denied those requests at the PPT meeting held on September 5, 2001. (Exhibit H.O.-1). On the first day of the hearing, July 19, 2002, the parent presented

October 29, 2002          -2-          Final Decision and Order 02-138

sufficient legal argument to overcome the Board's jurisdictional challenge based on the appropriate statute of limitations and the student's graduation with a regular diploma.

**FINDINGS OF FACT:**

1. In 1993, the student was diagnosed with Asperger's syndrome and ADHD and was identified as a special education student. (Exhibits P-6, p. 4, and P-8). Immediately thereafter, the Board supported the student's placement in various private facilities. Subsequent to the private placements, the student received special education and related services at the Board high school from freshman through senior year, which encompassed school years 1996-97, 1997-98, 1998-99, and 1999-2000.

2. The student's IEPs were a combination of mainstream academic courses and time in the resource room for specific skill-building, monitoring by teachers, and work on homework. Time spent in the resource room represented self-contained special education hours. Although not specifically an academic course, the student was graded for time in the resource room based on on-task performance, focus, attendance, and appropriate interaction with others. The student started high school with poor social skills, no interaction with others, sometimes displaying "explosive" and "aggressive" behaviors, but he "improved" over four years and by senior year was able to "self-censor." (Testimony of Board high school coordinator of comprehensive support program/formerly known as the self-contained program, September 5, 2002).

3. The student turned 18 years old in September 1999, during the fall of the student's senior year at the Board high school, at which time the parent's rights transferred to the student. R.C.S.A. Section 10-76a-1(n). The student was no longer a "child," as defined in C.G.S. Section 10-76a(2), when the parent, not the student, requested this due process hearing in April 2002. [See C.G.S. Section 10-76h(a)(1) regarding who may request a due process hearing.] There is no evidence that the student has been found to be incompetent or was unable to provide informed consent with respect to his educational program. The record contains a power of attorney given by the student to his parent on June 2, 2002, for the purpose of acting on his behalf "for all educational issues." Exhibit P-34. The student appeared on one of the seven days of the hearing on this matter.

4. The parent and the student participated in the IEP meetings at the end of each high school year, held respectively on May 19, 1997 (Exhibit P-10), May 28, 1998 (Exhibit P-12), and April 16, 1999 (Exhibit P-17). The student's IEPs for the 1997-98, 1998-99, and 1999-2000 school years each provided for appropriate academic coursework selected by the student from the Board curriculum (Exhibits P-32, P-39) with the assistance of the Board high school guidance counselor, counseling, and a transition plan, and each IEP indicated a projected graduation date as June 2000. Exhibits P-10, P-12, and P-17. The parent and the student participated in the PPT meeting convened on December 14, 1999, six months prior to the anticipated date of graduation. (Exhibit P-20). There is nothing in the minutes of that PPT meeting to indicate that the parent, the student, or any school personnel questioned

graduation to occur in June 2000, discussed a need to modify or alter graduation requirements for the student, or discussed the student's being in danger of not graduating. (Exhibit P-20).

5. During his testimony on July 31, 2002, the student was composed and focused precisely on the questions asked of him; his answers were thoughtful and articulate. The student testified that he had enjoyed being a student at the Board high school, that he had been happy with his teachers, and that he had been "mostly happy" with his courses. The student had advanced grade to grade and earned a 2.3 cumulative grade point average. (Exhibit P-23, p. 1). The student testified unequivocally that he wanted to graduate at the end of his senior year. With regard to post-high school plans, the student testified that he wanted to work for a year in order to earn money and have "real world experience," which he thought would be "helpful" if he needed to get a job during college. On the SAT given in May 1999, the student had obtained a verbal score of 600 and a math score of 430. On the SAT given in December 1999, the student had obtained a verbal score of 560 and a math score of 410. (Exhibit P-23, p.2). The student testified that he knew that he would need "some form of college education" "in order to succeed." He testified that he had discussed college with the Board guidance counselor and reviewed with her the course requirements as they pertained to college applications and admissions. The student testified that he knew at the time that "lack of a foreign language [course] was some form of detriment." With regard to a Latin course, the parent testified that the student dropped the course "not because he was unable to do the work" but because he was "not motivated enough to be there;" the teacher required homework to be turned in at the beginning of the class, "[the student] was always late" and "he disagreed with the homework policy, so he dropped [Latin]." (Testimony of the parent, September 5, 2002). The student described the positive growth in his friendships with peers from ninth grade through senior year and his enjoyable involvement in a school role-playing/strategy club. From April of his senior year to the date of graduation, without on-going supervision or job coaching, the student was successfully employed in a part-time job at a pet store, testifying that he had "always had an affinity for animals." Testimony of the student, July 31, 2002.

6. According to the Board social worker, the student's IEP called for counseling with the Board social worker, one-on-one, for approximately 20 minutes per week, for the purpose of addressing anger management, organizational skills, "behaviors," and self-advocacy. (Exhibit P-17, p. 11; Testimony of Board social worker, October 18, 2002). The student testified that he met with the social worker "when [he] felt like it." Testimony of the student, July 31, 2002. The Board social worker testified that early on the student had told her he was not interested in meeting with her individually and that "clinically speaking, you cannot enforce the delivery of [counseling] services." She stated also that the student showed growth in terms of social interaction, that he had "an oppositional streak," but responded to direction and help. The student's behavioral issues in his senior year were different from issues in the ninth grade. In the ninth grade, there were "social difficulties" and "inappropriate comments." In senior year, the student was preoccupied with his social life and friends, leading to tardiness and class-cutting. The student's father died in 1998. The Board social worker stated that there were no clinical signs of depression or unhappiness.

FROM : DEBBIE... FAX NO. : ... Case 3:02-cv-02193-WWE    Document 18-2    Filed 12/18/2003    Page 5 of 10    Dec. 10 2002 01:19PM P22

October 29, 2002                    -4-                    Final Decision and Order 02-138

"[The student] put a lot of energy into being well." Testimony of Board social worker, October 18, 2002.

7. The student testified that graduation meant to him "an end to a significant part of my life," "the end of the bulk of my education," and "the end of a lot of fun, possibly the best four years of my life." The parent testified that she never knew that her son "could have walked down the aisle" without actually graduating (Testimony of the parent, July 19, 2002), but the student testified that he understood graduation to be the end of his time at the Board high school and that the alternative discussed by the PPT, to continue at the Board high school and graduate mid-year during the 2000-2001 school year, did not interest him. "I didn't want to be in school anymore; I didn't want to take more courses." The student stated that he "knew [he] had taken the prerequisites [for graduation] in one form or another," and that no one told him that he did not have the prerequisites to graduate. He testified that no one had explained that special education services would end with his graduation. He had no expectation of post-graduation services but "[his] mom might have." Testimony of the student, July 31, 2002.

8. The student's mother and the student participated in all IEP meetings. At no time during the student's four years at the Board high school had the PPT modified the state requirements for the student, as permitted by C.G.S. Sec. 10-221a, nor had the PPT determined at any time that the state requirements were inappropriate for the student. With regard to an algebra course, the parent testified that the student "didn't feel like he wanted to be there, so he dropped [the course]." (Testimony of the parent, September 4, 2002). By the end of the 1999-2000 school year, the student had successfully, albeit not brilliantly, met the requirements for graduation as set forth in C.G.S. Sec. 10-221a and as set forth in the Board high school course of study (Exhibit P-39, p. 3). Exhibit P-23; testimony of Claude Frank, housemaster of Board high school, September 5, 2002. On June 22, 2000, at age 18, the student graduated from the Board high school with a regular high school diploma. Neither the parent nor the student has asked that the student's diploma be rescinded.

9. After graduation, the student continued in the job he had begun in April 2000 and, without job-coaching or other monitoring, successfully worked there full-time until October 2000, when he left because of a confrontation with a co-worker. From October 2001 to May 2002, the student worked part-time at a bookstore, a job for which he had interviewed, but, according to the student, business was bad so his work hours were eventually reduced to none at all. The student's testimony reflected pride in his ability to do the job. At some point in this chronology, the student interviewed for a job at a copying store, but testified that he had "purposely botched" the interview. Testimony of the student, July 31, 2002.

10. Despite the fact that the parent's rights had transferred to the student when the student turned 18 years old, the parent requested the PPT meeting which was held on September 5, 2001. The parent testified that she requested the PPT meeting because page one of the two-page meeting summary written at the "exit PPT" on May 26, 2000, indicated that the "date of next annual review" was "5-29-01." (Exhibit P-21, p.1). Since no PPT meeting was convened in May 2001, the parent believed a PPT meeting was necessary even though the student had graduated in June 2000. At the PPT meeting on September 5, 2001, the Board denied the

FROM : DEBBIE BERLINER CT JEWISH LEDG    FAX NO. :    Dec. 10 2002 01:20PM P23
Case 3:02-cv-02192-WWE    Document 18-2    Filed 12/18/2003    Page 6 of 10

October 29, 2002                    -5-              Final Decision and Order 02-138

parent's request that the Board pay for a "job/social coach," compensatory education in the form of "college courses for credit," and "an independent evaluation by an expert in Asperger's Syndrome to determine if [the student] received an appropriate education" at the Board high school. (Exhibit P-31, p. 2).

11. The Board school psychologist evaluated the student at age 17, at the end of eleventh grade. The report of the assessment stated that the student participated eagerly in the cognitive testing, announcing his belief that he would do well because of an "advanced vocabulary" attributable to his "being an avid reader." (Exhibit B-6, p. 1). On the WAIS-III, the student achieved a verbal IQ of 121, "which is in the above average superior range;" a performance IQ of 91, "which indicates his visual-spatial perceptual ability is low average;" and a full scale IQ score of 107, described as "average, although this should be cautiously interpreted because of the wide discrepancy between [the student's] verbal and performance IQ scores." The Board school psychologist summarized his assessment of the student: "He has benefited from a highly structured, individualized program and has developed good relationships with staff and students. He can be thoughtful and reflective and is clearly working on developing more effective coping strategies which should continue to facilitate his overall functioning. [Difficulties with] [s]ocial interactions, impulsivity, and poor judgment continue to be present." (Exhibit B-6, p. 2).

12. On October 15, 2001, and November 20, 2001, the student, age 20, participated in a "psychological consultation" with Adrienne G. Smaller, Ph.D. The student "expressed aspirations to go to college, and thought he might take some courses at a nearby community college." Dr. Smaller reported that the student "was adamant about not wanting to enlist the help of BRS (Bureau of Rehabilitation Services), because he did not find them to be helpful." Dr. Smaller reported further that "[w]hile [the student] appears to be doing well now, he remains quite vulnerable in the area of vocational and social skills. He is also resistant to any type of job coach or shadowing to take place in his workplace, as that would be embarrassing for him." Dr. Smaller's report concluded that the student "is a very bright young man," but "needs support in order to pursue an academic degree and to be successful in the workplace." (Exhibit P-29). Dr. Smaller's testimony on July 19, 2002, while credible, added no information not already set forth in her report.

13. Since August 26, 2002, the student has been enrolled at Mitchell College, a fully-accredited, two-year college which provides services for all students with disabilities as well as tutoring and learning centers for students diagnosed with ADD/ADHD. The student is receiving "Level 1" support, the most comprehensive available, which provides for up to four hours per week with writing and learning specialists as well as Section 504 accommodations and modifications. Mitchell College offers no remedial or high school courses; the student is enrolled in four or five college-level courses, chosen with the assistance of a counselor. A campus counseling center and an office of work and learning are available to the student. Social skills training and independent living are addressed "as they impact classroom/academic issues" but there is "no training *per se*." (Testimony of Dr. Peter Troiano, Mitchell College academic dean, September 4, 2002). Over the course of the first five weeks of the school year, the parent has visited at Mitchell College, spoken to the

October 29, 2002                           -6-                    Final Decision and Order 02-138

student by phone, and discussed the student with Mitchell College staff. The parent testified that the student is "doing okay, not tremendous, not poorly." The student's five-week progress report (Exhibit P-40) shows a number of problems with attendance and homework completion, but the parent testified that "since the progress report, [the student] has made up everything shown lacking; he has recognized that he can't slide by; he has improved." Testimony of the parent, September 13, 2002.

### CONCLUSIONS OF LAW:

1. The federal regulations implementing the IDEA require that school districts provide a FAPE to children with qualifying disabilities "through" the age of twenty-one. 34 C.F.R. Section 300.121. However, under the IDEA, the Board is not obligated to make FAPE available to a student who has graduated from high school with a regular high school diploma. 34 C.F.R. Section 300.122(a)(3)(i). Connecticut law provides that the obligation to provide special education terminates when a child is graduated from high school or "reaches" age twenty-one, whichever occurs first. C.G.S. Section 10-76d(b). The Board contends that because the student graduated with a regular high school diploma, at age 18, the Board has had no obligation to provide the student with special education or related services since June 2000. The hearing officer agrees with the Board.

2. To graduate a student with a disability under the IDEA, the student must meet the general graduation requirements and make progress on or complete the IEP goals and objectives. Chuhran v. Walled Lake Consolidated Schools, 839 F.Supp. 465, 474 (E.D.Mich. 1993), aff'd, 51 F.3d 271 (6th Cir. 1995). Automatic grade promotion does not necessarily mean that the disabled child received a FAPE or is required to be graduated. Hendrick Hudson District Bd. of Education v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034 (1982). In this case, however, the student's academic progress grade to grade, although not stellar, was sufficient for the student to meet the regular education graduation requirements established by both the State of Connecticut (C.G.S. Section 10-221a) and the Board. No evidence was presented to establish that the student required modification of the state and local graduation requirements or that the PPT had found such requirements to be inappropriate. See C.G.S. Section 10-221a(d). "Children who graduate from our public school systems are considered by our society to have been 'educated' at least to the grade level they have completed, and access to an 'education' for handicapped children is precisely what Congress sought to provide in the [IDEA]." Rowley, supra, 458 U.S. at 203, 102 S.Ct. at 3034; 103 F.3d 1114 (2d Cir. 1997).

3. Graduation from high school with a regular education diploma terminates any entitlement to special education services and thus constitutes a "change in placement" that requires prior written notice. 34 C.F.R. Section 300.122(a)(3)(i), (iii). The written notice of the anticipated graduation must be provided a "reasonable time" before graduation. 34 C.F.R. Section 300.503(a)(1)(i). The record in this case contains evidence that the parent and the student participated in IEP meetings on May 19, 1997, May 29, 1998, April 16, 1999, and May 26, 2000; the IEP developed at each of those meetings clearly stated the student's anticipated date of graduation as June 2000. (Exhibits P-10, pp. 1,8; P-12, pp. 1, 18; P-17, pp. 1, 10; and P-21, pp. 1, 2). Additionally, the parent and the student participated in a PPT meeting on

December 14, 1999, six months prior to the anticipated graduation. Although college plans, employment, and behavior concerns were discussed at that meeting, there is no evidence to suggest any discussion that graduation requirements needed to be modified or that graduation itself should be postponed. (Exhibit P-20). Any claim that the student's graduation was inappropriate based on lack of prior written notice is hereby rejected. See Quaker Valley School District, 30 IDELR 634 (Pa. 1999).

4. Relying on Letter to Riffel, 34 IDELR 292 (2000), the parent has argued that a student's graduation does not automatically relieve the Board of its responsibility to provide compensatory education and related services where there has been a denial of FAPE. However, as pointed out in Riffel, "Part B does not authorize a school district to provide a student with compensatory education, through the provision of instruction or services, at the postsecondary level. See [34] C.F.R. Sec. 300.25. If a student is awarded compensatory education to cure the denial of FAPE during the period when the student was entitled to FAPE, the compensatory education must be the type of educational and related services that are part of elementary and secondary school education offered by the State." It is concluded that even if there had been a denial of FAPE in this case, the hearing officer is without authority to order the Board to fund the student's placement at Mitchell College since Mitchell College does not offer high school-level or remedial courses. Testimony of Peter Troiano, Mitchell College academic dean, September 4, 2002.

5. On the first day of hearing this matter, the hearing officer determined that June 22, 2000, the date of the student's graduation, a change in placement, triggered the running of the statute of limitations. Notwithstanding the fact that the parent's rights had, in fact, been transferred to the student on his 18th birthday in September 1999, the parent requested due process hearing on April 24, 2002, within the two-year period. (Exhibit H.O.-1). Although it is doubtful that the Board can be held accountable for action before April 24, 2000, the student's IQ scores, academic record, evaluations and IEPs before that date were considered in order to determine whether the student's IEPs were reasonably calculated to enable the student to receive educational benefits, whether the Board properly determined the student's eligibility for graduation, and whether there was a denial of FAPE or procedural violations sufficiently gross as to warrant an award of compensatory education. See Kevin T. v. Elmhurst Community School District, 36 IDELR 153, fn. 5 (N.D. Illinois 2002); 34 IDELR 292, Letter to Riffel; Mrs. C. v. Wheaton, 916 F.2d 69 (2d Cir. 1990). Based on the parties' exhibits and testimony, over the course of seven hearing dates, from the student, the parent, a representative of the Bureau of Rehabilitation Services (BRS), Dr. Adrienne Smaller, and Board personnel including the social worker, special education monitor, special education coordinator, transition counselor, and high school headmaster, the student received a free, appropriate public education while he was at the Board high school and his graduation with a regular diploma was not improperly granted. It is further found that there were no procedural violations sufficient to warrant an award of compensatory education.

6. While the parent's concerns for her son are understandable, the IDEA does not require a Board to develop IEPs that "maximize the potential of handicapped children." Board of Education v. Rowley, 458 U.S. at 189, 102 S.Ct. at 3042. What the statute guarantees is an

October 29, 2002                         -8-                Final Decision and Order 02-138

"appropriate" education, "not one that provides everything that might be thought desirable by loving parents." <u>Walczak v. Florida Union Free School District</u>, 142 F.3d 119, 132 (2d Cir. 1998), citing <u>Tucker v. Bay Shore Union Free School District</u>, 873 F.2d 563, 567 (2d Cir. 1989).

### FINAL DECISION AND ORDER:

1. The student's eligibility for graduation was properly determined.

2. Having graduated from the Board high school with a regular diploma, the student was not entitled to any further special education or related services at Board expense during the 2000-2001 and 2001-2002 school years.

3. The request for compensatory education and independent evaluation is denied.

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Title 20, United States Code 1415(e).

_____
Hearing Officer Signature

_____
Hearing Officer    Name in Print

signpage.doc (ho disk)
7/1/00