**APPENDIX**

*Berliner*

## Calendar No. 46

| 105TH CONGRESS<br>1st Session | SENATE | REPORT<br>105–17 |
| --- | --- | --- |

## INDIVIDUALS WITH DISABILITIES EDUCATION ACT AMENDMENTS OF 1997

MAY 9, 1997.—Ordered to be printed

Mr. JEFFORDS, from the Committee on Labor and Human Resources, submitted the following

## REPORT

[To accompany S. 717]

The Committee on Labor and Human Resources, to which was referred the bill (S. 717) to amend the Individuals with Disabilities Education Act, to reauthorize and make improvements to that Act, and for other purposes, having considered the same, reports favorably thereon and recommends that the bill do pass.

## CONTENTS

|  | Page |
| --- | --- |
| I. Introduction | 1 |
| II. Purpose and summary | 2 |
| III. Background and need for legislation | 2 |
| IV. Legislative history and committee action | 4 |
| V. Explanation of bill and committee views | 4 |
| VI. Cost estimate | 40 |
| VII. Regulatory impact statement | 45 |
| VIII. Application of law to the legislative branch | 45 |
| IX. Section-by-section analysis | 46 |
| X. Changes in existing law | 61 |

### I. INTRODUCTION

S. 717 was the result of extensive discussions among Senators and Congressmen, and officials of the U.S. Department of Education, as well as recommendations from parents of children with disabilities, educators, and other individuals interested in improving the quality of education for children with disabilities. S. 717 and its companion bill in the House, H.R. 5, as amended, are identical. The legislation was developed through a bicameral, biparti-

39–010

4

## IV. LEGISLATIVE HISTORY AND COMMITTEE ACTION

The committee considered the legislation on May 7, 1997. Chairman Jeffords offered four amendments en bloc. The first amendment makes clear that States are not obligated by Federal law to provide IDEA services to individuals aged 18 to 21 who are incarcerated in an adult prison and who were not receiving services immediately prior to their incarceration. If they were receiving services, the obligation to provide services, would continue. The second amendment clarifies that the only two exceptions to the so-called "stay put" rule in section 615(k) are when guns or drugs are involved, or when continued placement is substantially likely to result in physical harm. For all other violations of school rules or codes of conduct the stay put rule applies. Thus, if a child's parents object to a change in placement, the child would stay in his or her current placement. The third amendment defines substantial evidence for the purposes of the subsection of the bill dealing with placement in an alternative educational setting. A hearing officer's determination that continued placement is substantially likely to result in harm would require something more than a preponderance of the evidence. The fourth amendment clarifies what the law is today with respect to referral for enforcement, which may include referral to the Department of Justice.

Senator Gregg offered, and then withdrew, an amendment to specify minimum levels of appropriations to be provided in each of the fiscal years 1998 through 2004. Under the amendment, appropriations would be authorized at not less than $4,107,522,000 for fiscal year—an increase of $1 billion over the current funding level. Not less than $13,107,522,000 would be authorized in fiscal year 2004—an increase of $10 billion over the current level.

Final Action. The bill as amended was reported favorably by unanimous voice vote.

## V. EXPLANATION OF BILL AND COMMITTEE VIEWS

The purposes of the Individuals with Disabilities Education Act Amendments of 1997 are to clarify and strengthen the Individuals with Disabilities Education Act (IDEA) by providing parents and educators with the tools to:

Preserve the right of children with disabilities to a free appropriate public education;

Promote improved educational results for children with disabilities through early intervention, preschool, and educational experiences that prepare them for later educational challenges and employment;

Expand and promote opportunities for parents, special education, related services, regular education and early intervention service providers, and other personnel to work in new partnerships at both the State and local levels;

Create incentives to enhance the capacity of schools and other community-based entities to work effectively with children with disabilities and their families, through targeted funding for personnel training, research, media, technology, and the dissemination of technical assistance and best practices.

5

In its 22-year life span, the Individuals with Disabilities Education Act has achieved many of the important goals it sought to achieve. Children with disabilities are for the most part well served in America's public and private schools and are guaranteed the right in every State and outlying area to a free appropriate public education by law.

The IDEA has been a very successful law. Prior to its implementation, approximately 1 million children with disabilities were denied education. The number of children with developmental disabilities in State institutions has declined by close to 90 percent. The number of young adults with disabilities enrolled in postsecondary education has tripled, and the unemployment rate for individuals with disabilities in their twenties is almost half that of their older counterparts.

Despite this progress, the promise of the law has not been fulfilled for too many children with disabilities. Too many students with disabilities are failing courses and dropping out of school. Almost twice as many students with disabilities drop out as compared to students without disabilities. Of further concern is the continued inappropriate placement of children from minority backgrounds and children with limited English proficiency in special education. In addition, school officials and others complain that the current law is unclear and focuses too much on paperwork and process rather than on improving results for children.

This authorization is viewed by the committee as an opportunity to review, strengthen, and improve IDEA to better educate children with disabilities and enable them to achieve a quality education by:

(1) Strengthening the role of parents;

(2) Ensuring access to the general education curriculum and reforms;

(3) Focusing on teaching and learning while reducing unnecessary paperwork requirements;

(4) Assisting educational agencies in addressing the costs of improving special education and related services to children with disabilities;

(5) Giving increased attention to racial, ethnic, and linguistic diversity to prevent inappropriate identification and mislabeling;

(6) Ensuring schools are safe and conducive to learning; and

(7) Encouraging parents and educators to work out their differences by using nonadversarial means.

In drafting the bill, the committee was guided by the premise that, to achieve a quality education for children with disabilities, it should start with current law and build on the actions, experiences, information, facts, and research gathered over the life of the law, particularly in the last 3 years. Further, in developing these amendments the committee distinguished between problems of implementation and problems with the law, and responded appropriately in addressing any issue raised.

Through this legislation the committee intends to encourage exemplary practices that lead to improved teaching and learning experiences for children with disabilities, and that in turn, for these children, result in productive independent adult lives, including employment. Through these efforts, the committee intends to assist

22

gram. For this reason, in the bill the committee has added "location" to the provision in the IEP that includes "the projected date for the beginning of services and modifications, and the anticipated frequency, *location*, and duration of those services" (emphasis added).

The bill requires that the IEP include, beginning at age 14 "a statement of the transition service needs of the child under the applicable components of the transition service needs of the child's IEP that focuses on the child's courses of study (such as participation in advanced placement courses or a vocational education program)." The purpose of this requirement is to focus attention on how the child's educational program can be planned to help the child make a successful transition to his or her goals for life after secondary school. This provision is designed to augment, and not replace, the separate transition services requirement, under which children with disabilities beginning no later than age sixteen receive transition services including instruction, community experiences, the development of employment and other post-school objectives and, when appropriate, independent living skills and functional vocational evaluation. For example, for a child whose transition goal is a job, a transition service could be teaching the child how to get to the job site on public transportation.

Current law is not clear on what is required when a child with a disability attains the age of majority. In order to clarify the situation, the IEP definition in the bill includes a statement that the child has been informed of his or her rights under part B, if any, that will transfer to the child when he or she attains the age of majority. The bill clarifies that when a child is considered incapable of making educational decisions, the State will develop procedures for appointing the parent or another individual to represent the interests of the child. This transfer of rights is also addressed under section 615(m) in the bill.

Additionally, the bill requires that a child's IEP include a statement of how the child's progress toward the annual goals will be measured and how the child's progress will be regularly informed of the child's progress toward those goals (by such means as report cards) as often as parents are informed of their nondisabled children's progress. The committee believes that informing parents of children with disabilities as often as parents will, in fact, reduce the cost of informing parents of children with disabilities and facilitate more useful feedback on their child's performance. One method recommended by the committee would be providing an IEP report card with the general education report card, if the latter is appropriate and provided for the child.

An IEP report card could also be made more useful by including checkboxes or equivalent options that enable the parents and the special educator to review and judge the performance of the child.

An example would be to state a goal or benchmark on the IEP report card and rank it on a multipoint continuum. The goal might be, "Ted will demonstrate effective literal comprehension." The ranking system would then state the following, as indicated by a checkbox. No progress; some progress; good progress; almost complete; completed. Of course, these concepts would be used by the school and the IEP team when appropriate. This example is not in-

23

tended to indicate the committee's preference for a single means of compliance with this requirement.

The bill's definition of the Individualized Education Program team includes the parents of a child with a disability; at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment); at least one special education teacher, or where appropriate, at least one special education provider of such child; a representative of the local education agency who is (a) qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (b) knowledgeable about the general curriculum; and (c) knowledgeable about the availability of resources of the local educational agency; an individual who can interpret the instructional implications of evaluation results, who may be a member of the team; at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and whenever appropriate, the child with a disability.

Very often, regular education teachers play a central role in the education of children with disabilities. In that regard the bill provides that regular education teacher, participate on the IEP team, but this provision is to be construed in light of the bill's proviso that the regular education teacher, to the extent appropriate, participate in the development of the IEP of the child. The committee recognizes the reasonable concern that the provision including the regular education teacher might create an impression that the teacher participate in all aspects of the IEP team's work. The committee does not intend that to be the case and only intends it to be the extent appropriate. The committee wishes to emphasize that the "support" for school personnel, which is stated in the child's IEP, if the support that will assist them to help a particular child progress in the general education curriculum.

Related services personnel should be included on the team when a particular related service will be discussed at the request of a child's parents or the school. Such personnel can include personnel knowledgeable about services that are not strictly special education services, such as specialists in curriculum content areas such as reading. Furthermore, the committee recognizes that there are situations that merit the presence of a licensed registered school nurse on the IEP team. The committee also recognizes that schools sometimes are assumed to be responsible for all health-care costs connected to a child's participation in school. The committee wishes to encourage, to the greatest extent practicable and when appropriate, the participation of a licensed registered school nurse on the IEP team to help define and make decisions about how to safely address a child's educationally related health needs.

The bill also clarifies obligations in two areas. First, nothing in section 614 may be construed to require the IEP team to include information in another component of a child's IEP that is already contained in another component. Second, section 614 requires that each LEA or State educational agency ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child. The committee expects that the majority of placement decisions will be made